UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| ROBERT SMITH,<br>    Plaintiff, | ) ) ) | CIVIL ACTION NO. 2:05-cv-78 |
| v. | ) ) | PLAINTIFF'S MEMORANDUM |
| | ) | IN SUPPORT OF MOTION FOR |
| JAMES MORSE,<br>    In his official capacity as<br>Commissioner of the Vermont<br>Department For Children and<br>Families,<br>        Defendant. | ) ) ) ) ) ) | PRELIMINARY INJUNCTION |

CLERK
BY
DEPUTY CLERK
2005 MAR 29 A 8: 53
U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**Introduction**

Plaintiff is a Vermont octogenarian who resides at the Cedar Hill Healthcare Center (Cedar Hill) in Windsor, Vermont. In November of 2004, Plaintiff moved $252,347.44 from an account titled to his revocable trust to his personal checking account. One week later he loaned all of the money to his three sons, taking back a mortgage on their homes to secure the loans.

The Vermont Department for Children and Families (DCF) initially denied his application for benefits because his transfer of funds constituted "the establishment of a revocable trust." Complaint ¶ 20. Under DCF Medicaid policy, however, "[DCF] does not impose a penalty for transfers involving trusts that meet one or more of the following criteria. . . . The action that constituted the transfer was the establishment of a revocable trust. M440.31(e). Not only was this denial obviously wrong as a matter of law, it did not even accurately reflect the facts, since Plaintiff had transferred money *from* his trust not *to* his trust. Complaint ¶ 8.

1

DCF revised its denial to allege an equally untenable analysis. The "Revised Notice of Decision" says that Plaintiff is ineligible for benefits for years because Plaintiff's revocable trust has made payments to people other than Plaintiff. Complaint at ¶ 23. The bank records and information provided to DCF by Plaintiff and his counsel unequivocally show that the only payments made from Plaintiff's revocable trust were to Plaintiff's personal checking account.

The belief that either of these denial notices were based on a good faith determination of Plaintiff's eligibility under Vermont Medicaid regulations would require attributing a degree of incompetence to DCF personnel completely unwarranted by their efficient administration of the complex Medicaid program. Plaintiff asserts, and will seek to prove at hearing, that these denials are a pretext for DCF's policy of determining that all loans (or all loans made by Tapper Law Offices' clients) are transfers for less than fair market value. Having been forced to litigate the legality of their policy of requiring applicants for Medicaid to divulge whether or not a loan was made to qualify for benefits, (See, *Roach v. Morse*, 1:05-CV-06, USDC, Vermont, 2005) DCF has dispensed with such inquiry, applying a presumption that any loans made by clients of Tapper Law Offices are for the purpose of qualifying for Medicaid and are, therefore, subject to the imposition of a disqualification period.

**Likelihood of Success on the Merits**

**The Supremacy of Federal Law in State Medicaid Policy**

> The Commissioner of Social Security may enter into an
> agreement with any State which wishes to do so under which the
> Commissioner will determine eligibility for medical assistance in
> the case of aged, blind, or disabled individuals under such State's

> plan approved under title XIX. Any such agreement shall provide
> for payments by the State, for use by the Commissioner of Social
> Security in carrying out the agreement, of an amount equal to
> one-half of the cost of carrying out the agreement, but in
> computing such cost with respect to individuals eligible for
> benefits under this title, the Commissioner of Social Security
> shall include only those costs which are additional to the costs
> incurred in carrying out this title.  42 U.S.C. § 1383c(a).

Forty-two states, including Vermont, have entered into such agreements with the Commissioner of Social Security and saved significant costs in the processing of Medicaid eligibility for their entire SSI population.

"Section 1634 agreements" (named for their location in the Social Security Act which is codified at 42 U.S.C. § 1383c(a)) create obligations on the states as well.  To the extent that a state opens Medicaid eligibility to certain optional groups, such as the "medically needy," the state is limited to applying a methodology to determining eligibility for such groups that is no more restrictive than the methodology employed for determining eligibility for SSI.  This "no more restrictive methodology" admonition is reiterated in several different layers of federal law, from the Social Security Act, to federal regulations, to federal rules.

> (C) that if medical assistance is included for any group of
> individuals described in section 1905(a) who are not described in
> subparagraph (A) or (E), then—
> (i) the plan must include a description of (I) the criteria for determining eligibility
> of individuals in the group for such medical assistance, (II) the amount, duration,
> and scope of medical assistance made available to individuals in the group, and
> (III) the single standard to be employed in determining income and resource
> eligibility for all such groups, and the methodology to be employed in
> determining such eligibility, which shall be no more restrictive than the
> methodology which would be employed under the supplemental security income
> program in the case of groups consisting of aged, blind, or disabled individuals in
> a State in which such program is in effect . . . (Emphasis Added)

42 U.S.C. § 1396a(a)(10)(C)

This prohibition against a more restrictive methodology is so absolute under federal law, that a 1634 state may not even employ a more liberal methodology –one that would entitle more people to become eligible—if such methodology results in a restriction of eligibility for even one person.

> For purposes of this subsection and subsection (a)(10), methodology is considered to be "no more restrictive" if, using the methodology, additional individuals may be eligible for medical assistance and no individuals who are otherwise eligible are made ineligible for such assistance.

42 U.S.C. §1396a(r)(2)(B)

42 U.S.C. §1396a(a)(17) grants to the Secretary of Health and Human Services (HHS) the authority to prescribe standards of income and resources for optional coverage groups under a state Medicaid plan.  HHS has promulgated regulations at 42 CFR §435.601 which allow 1634 states to have a methodology for determining eligibility for the aged medically needy which is less restrictive, but no more restrictive than the methodology used in determining eligibility for SSI.  The regulation is virtually identical to the statute.  *Id.*

The Department of HHS, through its designee, the Centers for Medicare and Medicaid Services (CMS) has also created rules to carry out this provision of the statute.

> [1634 states] may not use income or resource methods that are more restrictive than those used under the most closely related cash assistance program [SSI]. A method is more restrictive if any individual who is otherwise eligible under the rules of the most closely related cash assistance program is ineligible under your alternative method.  Therefore, do not employ a policy which, although it may result in a more liberal application of policy in some instances, results in denying Medicaid to persons who are eligible if the equivalent cash assistance rule is used to

4

determine eligibility.

CMS State Medicaid Manual § 3240.4

CMS defines a "methodology" in its rules:

Methodologies include, but are not limited to the following:

o  Definitions of income and resources,

o  Exclusions or disregards of income and resources,

o  Composition and number of persons that are included in the budgetary unit (including AFDC standard filing unit provision),

o  Deeming of income from spouses and parents,

o  Treatment of regular and periodic income,

•  Ownership of income and resources . . .

CMS State Medicaid Manual § 3625

Section 3625 also notes that the CMS State Medicaid Manual chapters relating to such methodologies are to be used in conjunction with the Social Security Administration's Programs Operational Manual System (POMS.)  In summary, the statute, regulations, and administrative rules are unambiguous: as long as it is a 1634 state, Vermont may never adopt a methodology for determining eligibility more restrictive than SSI.  (See, *Caldwell v. Blum*, 621 F.2d 491 (2d Cir. 1980), *Anna W. v. Bane,* 863 F.Supp.125, 129 (W.D.N.Y.,1993).)

In *Herweg v. Ray*, 45 U.S. 265 (1982), the Supreme Court struck down a state regulation concerning the "deeming" of spousal income that was in conflict with the Secretary of HHS's regulations as a violation of the federal authority Congress had delegated to the Secretary.  Justice Renquist wrote:

5

Because Congress has entrusted the primary responsibility of interpreting a statutory term to the Secretary, rather than to the courts, his definition is entitled to "legislative effect." *Herweg* at 275.

Similarly, in *Atkins v. Rivera*, 477 U.S. 154 (1986), the court upheld a Massachusetts provision which used a six-month accounting period for determining the "spend-down" for medically needy recipients of Medicaid. The court reiterated the Secretary's power to carry out the provisions of the Social Security Act, as long as the exercise of such power was not in conflict with the Act. The court found that the method for determining a Medicaid "spend-down" had no analogue in the SSI program and that the statute had specifically set out the income limits to be applied. The Secretary's interpretation of the statute, therefore, was entitled to the "legislative effect" that Justice Renquist wrote about in *Herweg*.

**Loans  Enforceable Under State Law Are "Fair Market Value" Transfers**

According to SSI methodology, the primary tool for determining whether such transactions are for fair market value is the enforceability of the written agreements. POMS SI01140.300. POMS SI 01120.220 C. sets out several specific criteria for determining whether a loan is "bona fide:" (1) the loan must be enforceable under state law; (2) the loan agreement must have been in effect at the time of the transaction,  (3) there must be an acknowledgement of an obligation to repay, (4) there must be a schedule for repayment and the "borrower's express intent to repay by pledging real or personal property, (5) the repayment must be feasible. The POMS explicitly does not require interest to be paid as an indication that the loan is "bona fide."

The Social Security Administration has provided further interpretation of the SSI

rules for loans beyond the POMS. In Social Security Ruling SSR 92-8p, (attached) SSA makes clear that the appropriate inquiry is to whether the loan agreement creates an enforceable obligation under state law, a "bona fide" loan under SSI rules.

> 1. A loan means an advance from lender to borrower that the borrower must repay, with or without interest. A loan can be cash or an in-kind advance in lieu of cash. For example, an advance of food or shelter can represent a loan of the pro rata share of household operating expenses. This applies to any commercial or noncommercial loan (between relatives, friends or others) that is recognized as enforceable under State law. The loan agreement may be oral or written, as long as it is enforceable under State law. . . .
> 3. When money or an in-kind advance in lieu of cash is given and accepted based on any understanding other than that it is to be repaid by the receiver, there is no loan involved for SSI purposes. It could be a gift, support payments, in-kind support and maintenance, etc., and must be treated as provided for in the rules applicable to such terms.
> 4. If there is a bona fide loan as defined in (1) above, there is a rebuttable presumption that the loan agreement is a resource of the lender for SSI purposes. For example, an SSI applicant or recipient reports making a loan to a relative. The loan agreement is oral. The oral agreement is found to be binding under State law. Accordingly, the loan is presumed to be a resource of the lender because it can be converted to cash if the lender calls for repayment from the borrower. The lender can rebut this presumption by showing that the loan cannot be converted to cash -- for example, because the borrower died without leaving an estate. . . .
> Documentation: Evidence must be obtained with respect to the existence of a bona fide loan agreement. The burden of proof with respect to the bona fide nature of the loan is with the applicant or recipient.

SSR 92-8p (1992)

The promissory notes in this case are fully enforceable under Vermont law (and the mortgages are enforceable in the other jurisdictions where they were drafted and recorded.) There is no question that the loans at issue are enforceable under state law and that they evidence an unconditional intent by the parties to the transaction to be bound by their promises, and the Defendant raises none in his denial notice. Consequently there is no question that the loans from Plaintiff to his sons are fair market value transfers under SSI rules. To treat them as "transfers for less than fair market value" under Vermont

Medicaid rules would create a methodology more restrictive than SSI, in contravention of Plaintiff's rights under 42 U.S.C. §1396a(r)(2)(B).

Vermont's policy of penalizing fair market value loans not only creates a method for eligibility more restrictive than SSI, it is a facial violation of the Social Security Act.

> The DPW thus effectively employed a test which penalizes an applicant for either making a transfer for less than fair market value _or_ to qualify for benefits.

*Mertz v. Houstoun*, 155 F. Supp 2d 415 (E.D.Pa. 2001.) (Emphasis in original.)

Like Vermont, Pennsylvania has a state plan and regulations which comply with federal law. The court found that where a state routinely assesses eligibility in a manner which conflicts with its own regulations "it has effectively supplanted its written plan with a contrary practice." Such a contrary practice presents a question appropriate for the exercise of federal court jurisdiction. *Mertz* at 431.

Defendant's practice of penalizing all loans, or at least all loans by clients of Tapper Law Offices has "effectively supplanted [Vermont's] written [Medicaid] plan with a contrary practice" in contravention of federal law. There is no other explanation for denying Plaintiff benefits on such obviously erroneous bases. That such flagrant violation of federal law contravenes the Supremacy Clause of the U. S. Constitution need not be belabored. The enforcement of state agency decisions that contravene federal law must be enjoined under the Supremacy Clause. *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 122 S.Ct. 1753 (2002)

8

**Due Process Claims**

The Vermont Supreme Court has found that an unpromulgated change of policy which adversely affects beneficiaries and which does not adhere to the rule-making strictures contained in the Vermont Administrative Procedures Act (VAPA) violates due process.

> In the present case, petitioners were entitled to the protection of due process when the Department decided to rescind its policy change without notice. Inasmuch as the Department's decision affected "the very means by which to live," it could not be implemented unilaterally without violating due process. Goldberg, 397 U.S. at 264. We decline to delineate the exact procedures due process requires when an agency makes such a decision, however, because we find that the Department's action fell within the definition of rulemaking under the APA, which provides procedures that adequately protect petitioners' rights. *In Re: Diel*, 158 Vt. 549, 556 (Vt. Supr. Ct., 1992.)

"Where due process or a statute directs an agency to adopt rules, the agency shall initiate rulemaking and adopt rules in the manner provided by sections 836-844 of this title." 3 V.S.A. § 831(a). The Vermont legislature has specifically directed Defendant Vermont Department for Families and Children to, "Submit plans and reports, make regulations, and in other respects comply with the provisions of the social security act which pertain to programs administered by the department." 33 V.S.A. § 104(b)(2).

Plaintiff has had no notice or opportunity to be heard as to DCF's policy of treating all loans as transfers for less than fair market value. By depriving Plaintiff of notice and opportunity to be heard, Defendant has deprived Plaintiff of his Medicaid benefits without due process of law. *Goldberg v. Kelly*, 397 U.S. 254 (1970). *In Re: Diel, supra.*

Plaintiff has a due process interest, not just in the Medicaid benefits for which he

has applied, or in the rules which govern his eligibility, but the process by which those

rules are made.

> The Court in *Carey v. Piphus* explained that a deprivation of
> procedural due process is actionable under § 1983 without regard to
> whether the same deprivation would have taken place even in the
> presence of proper procedural safeguards. 435 U.S., at 266, 98 S.Ct.,
> at 1053 (even if the deprivation was in fact justified, so the plaintiffs
> did not suffer any "other actual injury" caused by the lack of due
> process, "the fact remains that they were deprived of their right to
> procedural due process").

*Zinermon v. Burch*, 494 U.S. 113, 126, 110 S.Ct. 975, FN 11 (U.S.Fla.,1990)

Plaintiff asserts that the object of the VAPA is the requirement of such process in

order to protect the public from the very conduct at issue in this case: the application of

illegal practices and clandestine "policies" that affect the substantive right to entitlements

without public scrutiny or participation.  Like all procedural protections, the VAPA is a

check on state power, so as to prevent the state from using unbridled discretion

unlawfully.  Procedural due process in rulemaking serves the fundamental purpose of

allowing the public to feel that the government has dealt with them fairly.  *Carey v.

Piphus,* 435 U.S. 247, 262, 98 S.Ct. 1042, 1051, 55 L.Ed.2d 252 (1978).

**Irreparable Harm**

In order to prevail on their motion, Plaintiff's must show that without a

preliminary injunction, they will suffer irreparable harm and that there is a likelihood of

success on the merits. *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175

F. 3d 144, 149 (2[d] Cir. 1999.)

While a nursing home cannot evict a resident for non-payment while an

application for Medicaid is pending, (although Cedar Hill has already tried in this case)

the Department of Aging and Independent Living (DAIL) takes the position that once

Medicaid has been denied, a resident can be evicted for non-payment. (See Vermont
Licensing and Operating Rules for Nursing Homes 3.14(e)(6).)  Plaintiff can face such an
eviction on 30-day's notice, now that his application for Medicaid has been denied.
Although he is not required to exhaust his administrative remedies before bringing this
action under 42 U.S.C. § 1983 (see, *Patsy v. Florida Bd, Of Regents*, 457 U.S. 496
(1982) ) the administrative remedies afforded Plaintiff under Vermont law cannot work
quickly enough to forestall an eviction.  3. V.S.A. § 3091, *et seq.* require a final
determination within 90 days, although as a practical matter that time limit can be
extended for a variety of excuses.

   Plaintiff is already suffering the emotional distress of a civil suit against him in
Windsor Superior Court on his debt to Cedar Hill of over $22,000.00.  Having relied on
Medicaid policy promulgated by DCF and the federal law which DCF is obligated to
follow, Plaintiff faces the attack of a creditor and the likelihood of discharge to the
community where he does not have the resources to provide himself with adequate care.
That his claim for benefits is being denied on the basis of unpromulgated rules, deprives
him of due process, and subjects him to ongoing irreparable harm.  *Conn. Dept. of
Environmental Protection v. O.S.H.A.*, 356 F. 3d 226,231 (2d Cir. 2004).

   Plaintiff submits that there is a substantial likelihood of success on the merits of
his claims and that without an injunction, he will suffer irreparable harm.  He respectfully
requests the Court order a hearing at its first opportunity and award him the injunctive
relief he seeks in his motion.

Dated at Springfield, Vermont this 28th day of March, 2005.

Mark L. Tapper, Esq.
Tapper Law Offices
55 Clinton Street
Springfield, Vermont 05156
(802) 885-9666
000602582